UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO. 5:01-cv-266-Oc-10 GRJ

KRISTINE MARY NELSON, as Personal
Representative of the Estate of Robert Bruce
Nelson,

Plaintiff,

vs.

FREIGHTLINER LLC, a foreign limited liabil-
ity corporation; INTERSTATE EQUIPMENT
LEASING, INC., a foreign corporation, and
SWIFT TRANSPORTATION CO., INC., a
foreign corporation,

Defendants.

_____/

### DEFENDANTS, FREIGHTLINER LLC, INTERSTATE EQUIPMENT LEASING, INC., AND SWIFT TRANSPORTATION CO., INC.'S MOTION IN LIMINE TO EXCLUDE INADMISSIBLE TOXICOLOGICAL OPINION TESTIMONY FROM PLAINTIFF'S PATHOLOGIST, DR. WILLIAM ANDERSON

Defendants, Freightliner LLC ("Freightliner"), Interstate Equipment Leas-

ing, Inc. ("Interstate") and Swift Transportation Co., Inc. ("Swift"), respectfully

move this Court for the entry of an Order precluding Plaintiff's Expert Pathologist,

Dr. William Anderson ("Anderson"), from offering inadmissible toxicological

opinion testimony.

### Introduction

1.     Although Anderson is a *pathologist*, he apparently intends to offer

opinions concerning *forensic toxicology*. (D.E. #152).  These opinions, as further

discussed during his May 14, 2003 deposition, include statements to the effect that (a) he has "reviewed the differential spectrophotometric method used by this [Kentucky] laboratory and finds it to be scientifically reliable and perfectly appropriate for use in testing Robert Bruce Nelson's blood sample," (b) based upon his own experience, including daily interactions with toxicologists in the lab he uses, the results of the method used by the Kentucky laboratory is clearly an accepted analytical technique in the world of practicing forensic toxicologists, and (c) this methodology is employed in a number of crime laboratories around the country and represents a significant improvement in analytical accuracy and post-mortem samples, oftentimes comparing favorably when samples are run concurrently with the GC-MS methodology.

### Anderson's Opinions Are Based On Inadmissible Hearsay and Lack Predicate and Foundation

2.     The basis of Anderson's opinions was explored in detail during his deposition.    In a nutshell, Anderson testified his information is based on (1) conversations he had with a toxicology person (Linda Sullivan) at Weusthoff Lab in Melbourne, Florida, and (2) a paper about "Improved Principal Component Regression," the details of which he does not know. (*See* Exhibit "1" - - Anderson Dep., pp. 116-117).    Although Anderson states he really didn't speak with her about this case, Miss Sullivan, who does not have a Ph.D. in toxicology, apparently provided him the paper at his request.    (*Id.* at pp. 118-120); (*See* Exhibit "2" - - paper marked as Exhibit "9" at Anderson's deposition).    He has not

HERZFELD & RUBIN
80 S.W. 8TH STREET, SUITE 1920, MIAMI, FLORIDA 33130 • (305) 381-7999 • FAX: (305) 381-8203

spoken with any other toxicologist about this matter. (*Id.* at p.119). In fact, Anderson states his only conversations in this matter have been with Plaintiff's counsel. (*Id.* at p. 67).

3.    Anderson acknowledges that the laboratory he uses in his practice is Weusthoff (*Id.* at p. 124) but then stated <u>he's not sure what specific method Weusthoff is using at this point</u>. (*Id.* at p.127).

4.    His daily interactions with Weusthoff lab are not really daily. (*Id.* at p. 128). As to his statements about the methodology being employed in a number of crime labs throughout the country, he's not sure what labs they are; he can't give a list of such labs and basis his statements on a conversation with Ms. Sullivan. He cannot remember other toxicologists that he may have spoken to about this. (*Id.* at pp. 129-130). His statement is also based on the paper that he received. (Exhibit "2"). This paper also forms the basis for his opinion about the purported Kentucky methodology representing a significant improvement in analytical accuracy in post-mortem samples.

5.    As to his statement about the testing comparing favorably, again he is not sure but thinks it might have been in the paper, marked as Exhibit 9 to his Deposition (Exhibit "2"). He also states it was the opinion of Linda Sullivan. (*Id.* at p. 132).

6.    Anderson does not actually know the procedure utilized by the Kentucky lab. (*Id.* at p. 152). Even the statements made in his disclosure about

HERZFELD & RUBIN
80 S.W. 8TH STREET, SUITE 1920, MIAMI, FLORIDA 33130 • (305) 381-7999 • FAX: (305) 381-8203

how the method works are something about which he does not have knowledge. As to where he got this information, he "guesses" it was from the paper marked as Exhibit 9 to his deposition (Exhibit "2" to this Motion). (*Id.* at pp. 152-153). He then opined he might have gotten it from Linda (Sullivan). (*Id.* at pp. 153-154).

7.     As far as the methodologies and procedures used to analyze blood samples for the existence of carbon monoxide and carboxyhemoglobin, Anderson admitted that is something within the expertise of a toxicologist and not in the expertise of somebody like himself, a pathologist. (*Id.* at p. 154). Last, in terms of the Kentucky lab method and the details of what would be done, he would defer to a toxicologist on that issue. (*Id.* at pp. 154-155).   He would also defer to a toxicologist on the appropriateness of whether ammonium hydroxide or sodium dithionite should be used in this procedure. (*Id.* at p.155).

8.     In short, Anderson is not qualified to offer the foregoing toxicological opinions.  His attempted opinions in this regard are either based on hearsay from third parties (not listed to testify in trial in this matter) or lack predicate due to Anderson's lack of knowledge in this regard.  His testimony in this particular area is otherwise inadmissible.

9.     Moreover, the article Anderson relies on does not reference the methodology used by the Kentucky lab to analyze Mr. Nelson's post-mortem blood sample.

-4-

## Compliance With Middle District of Florida Rule 3.01(g)

10.    Defendants have conferred with Plaintiff on this issue.    Plaintiff disagrees with the relief sought in this Motion.

## Conclusion

**WHEREFORE,** Defendants, Freightliner LLC, Interstate Equipment Leasing, Inc., and Swift Transportation Co., Inc., respectfully urge this Court to enter an Order:

1.    Granting their Motion in Limine to Exclude Inadmissible Toxicological Opinion Testimony From Plaintiff's Pathologist, Dr. William Anderson,

2.    Precluding Dr. Anderson from offering any of the foregoing toxicological opinions at trial; and

3.    Granting such other relief as is necessary and proper.

MYRON SHAPIRO
Fla. Bar No. 399205
KENN W. GOFF
Fla. Bar No. 549460
**HERZFELD & RUBIN**
Attorneys for Defendants
80 S.W. 8TH Street, Suite 1920
Miami, Florida 33130
Telephone:    (305) 381-7999
Facsimile:    (305) 381-8203
E-Mail:    herzfeld@hr-miami.com

-5-

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served via facsimile and federal express this ____ day of August, 2003, to JOHN W. FROST, II, ESQ. and JOHN MARC TAMAYO, ESQ., Frost Tamayo Sessums & Aranda, P.A., attorneys for Plaintiff, Post Office Box 2188, Bartow, Florida 33831-2188.

MYRON SHAPIRO
Fla. Bar No. 399205
KENN W. GOFF
Fla. Bar No. 549460
**HERZFELD & RUBIN**
Attorneys for Defendants
80 S.W. 8TH Street, Suite 1920
Miami, Florida 33130
Telephone:   (305) 381-7999
Facsimile:    (305) 381-8203
E-Mail:        herzfeld@hr-miami.com

F:\Client\Freightliner\3746\Trial\Pldgs\Def'sMotioninLimine(WilliamAnderson).doc

-6-

# EXHIBIT "1"

1

1        UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
2              OCALA DIVISION

3        CASE NO. 5:01-CV-266-OC-10 GRJ

4   - - - - - - - - - - - - - - -X
    KRISTINE MARY NELSON, as Personal       :
5   Representative of the estate of Robert  :     **COPY**
    Bruce Nelson,                           :
6                                           :
                    Plaintiff,              :
7   vs.                                     :
                                            :
8   FREIGHTLINER LLC, a foreign limited     :
    liability corporation; INTERSTATE       :
9   EQUIPMENT LEASING, INC., a foreign      :
    corporation; and SWIFT TRANSPORTATION   :
10  CO., INC., a foreign corporation,       :
                                            :
11                  Defendants.             :
    - - - - - - - - - - - - - - -X
12
            DEPOSITION OF:      WILLIAM ANDERSON, M.D.
13

14  DATE:                May 14, 2003

15
    TIME:                1:15 p.m. to 7:20 p.m.
16

17  PLACE:               Michael Musetta & Associates
                         677 North Washington Street
18                       Sarasota, Florida

19
    PURSUANT TO:         Notice by counsel for Defendants
20                       for purposes of discovery, use
                         at trial or such other purposes
21                       as are permitted under the
                         Federal Rules of Civil Procedure
22

23  BEFORE:              HILLARY S. SQUIRE, RPR
                         Notary Public, State of
24                       Florida at Large

25                       Pages 1 - 216

1          (Defendants' Exhibit No. 6 was marked for

2     identification.)

3     BY MR. GOFF:

4          Q     Have you spoken with any law enforcement authority

5     concerning this case?

6          A     No.

7          Q     Have you spoken with anybody in the medical

8     examiner's office in Louisville, Kentucky, concerning this

9     case?

10         A     No.

11         Q     Have you spoken with the individual or individuals

12    that performed the post-mortem blood analysis on

13    Mr. Nelson's blood sample?

14         A     No.  I have not spoken with anybody in Kentucky

15    or, actually, anybody regarding this case at all.

16         Q     I assume you have talked with Mr. Tamayo about

17    this case.

18         A     Except Mr. Tamayo.

19         Q     Other than Mr. Tamayo, have you spoken with

20    anybody else about this case?

21         A     No.

22         Q     As part of your practice as a pathologist here in

23    Florida, and in other jurisdictions at which you've worked

24    over the years, do you have occasion to issue written

25    post-mortem examination reports such as that done by

1    A    Yes.

2    Q    If you could, please, Dr. Anderson, I'd just like

3  to ask you to look over that report and tell me what other

4  areas of disagreement you have with Dr. Wecht's report,

5  aside from what you have already mentioned to us about

6  Dr. Wecht possibly not feeling the CO level was accurate and

7  what you also just mentioned to us about what Dr. Wecht may

8  believe concerning acute changes in the heart, recognizing

9  we discussed that earlier today during your deposition.

10         MR. TAMAYO:  Object to the form.

11         THE WITNESS:  Well, I think we have been through

12  most of this, whether steps could have been taken to confirm

13  it.  They used sodium dithionate at their laboratory, which

14  my understanding is the improved method is by blanking out

15  the specimen, you don't need to do that anymore.

16  BY MR. GOFF:

17    Q    Your understanding is based on what?

18    A    My understanding of the reading of the information

19  about the test and the fact that it apparently is an

20  improved method that eliminates some of the problems with

21  the decomposition.

22    Q    Improved method from what method and according to

23  whom?

24    A    Well, I got this information, first, from my

25  toxicology person at Wuesthoff and then this paper about

1    improved principal component regression, the details of

2    which I don't know.  But this is -- apparently because it

3    blanks against the sample itself, you can get a better

4    readout, even with some of the other prior procedures.

5              But Dr. Wecht really doesn't mention that test.

6    It simply refers to the lab he works in and what they do.

7       Q    The toxicology person you're referring to is a

8    female toxicologist?

9       A    Right.  Linda Sullivan.

10      Q    And as I understand it, she provided you with a

11   paper?

12      A    Yes.

13      Q    At your request, I assume?

14      A    Yes.

15      Q    And may I see that paper, please?

16      A    And it's my understanding this is the methodology

17   used in this laboratory and a number of laboratories around

18   the country.

19      Q    What is that understanding based on?

20      A    That this is used in the Kentucky laboratory?

21      Q    And a number of other laboratories.

22      A    I think it's mentioned in the paper that different

23   laboratories utilize this.

24      Q    Just so we're clear, I'm going to mark as

25   Exhibit 9 the paper.

1          (Defendants' Exhibit No. 9 was marked for

2   identification.)

3   BY MR. GOFF:

4          Q    And, to save time, would you agree with me,

5   Dr. Anderson, that the title of the paper is "Measurement of

6   Carboxyhemoglobin in Forensic Blood Samples Using UV-Visible

7   spectrometry and Improved Principal Component Regression"?

8          A    (Indicates affirmatively).  Yes.

9          MR. TAMAYO:  Object to form.

10  BY MR. GOFF:

11         Q    Just to identify it.  That's all.

12         A    Or CO for short.

13         Q    When did -- is it Dr. Sullivan?

14         A    She's -- I think she's got a master's degree in

15  toxicology, but I don't think she's a Ph.D.

16         Q    When did Ms. Sullivan, or Mrs. Sullivan, provide

17  you this report?

18         A    I think she sent it over in the first part of

19  April.

20         Q    Would it be April 10 of 2003?

21         A    That's what the fax looks like, yes.

22         Q    And that would be four days prior to your

23  April 14th, 2003 disclosure, of course?

24         A    Right.  Uh-huh.  (Indicates affirmatively).

25         Q    Prior to receiving this report, did you have any

1 information as to the methodology used by the Kentucky lab

2 being used by labs in other parts of the country?

3     A    I think I had -- I'm not sure whether I had

4 learned that from Linda.  Probably from Linda, talking to

5 her.

6     Q    Have you spoken with any other toxicologist about

7 this case?

8     A    I didn't speak with her specifically about this

9 case.  I spoke with her about this method.  In other words,

10 I did not -- as I indicated before, I didn't talk to anybody

11 about the case, but I did talk to her about this specific

12 methodology but with no information about the case.

13     Q    Have you spoken with any other toxicologist about

14 the method used by the Kentucky laboratory to analyze

15 Mr. Nelson's post-mortem blood sample for the existence of

16 carboxyhemoglobin?  And I mean other than Mrs. Sullivan.

17     A    No.  I think we got -- this is what I got the

18 paper for, but, no.

19     Q    How many conversations did you have with

20 Mrs. Sullivan about the method used by the Kentucky lab to

21 analyze Mr. Nelson's blood sample for carboxyhemoglobin in

22 this case?

23     A    As I said, I really talked about this methodology

24 without reference to the Kentucky lab.  But that

25 methodology, probably I asked her about it and then she sent

1    me the paper.  Probably one call.  I call her a lot on

2    toxicology issues.

3        Q    In terms of what we were actually discussing, I

4    believe we were talking about your differences with

5    Dr. Wecht's report, and you have brought up the issue of

6    sodium dithionite and the context of this article that we

7    have just marked as Exhibit 9 and a conversation you had

8    with Ms. or Mrs. Sullivan.

9            What I would like to know at this time, please,

10   Dr. Anderson, if there's any other areas of disagreement

11   that you have with Dr. Wecht's February 14th, 2003, report,

12   other than what you've already told us.  And please feel

13   free to continue reviewing the report.

14       A    Like I said, I mean, I'm not necessarily --

15   basically his is a narrative, the narrative of what was

16   done, so it doesn't -- it's not really much of an opinion as

17   far as most of it goes.

18           So I don't see -- nothing stands out immediately.

19   But, again, his report did not bear upon my opinions.

20       Q    I understand that.  I'm just curious now, at this

21   time, if there's areas of his report that you disagree with,

22   notwithstanding that his report, as you state, didn't bear

23   upon your opinions.

24       A    I'd have to read this very carefully and study it

25   if I were going to do that, but it was not my intention to

1      Q     Are you a board-certified toxicologist?

2      A     No.   I'm a board-certified forensic pathologist.

3      Q     Do you have any doctorate degree in the field of

4   toxicology?

5      A     No.

6      Q     Do you have any master's degree in the field of

7   toxicology?

8      A     No.

9      Q     Do you have any bachelor's degree in the field of

10  toxicology?

11     A     No.

12     Q     In your report, i.e., your April 14th, 2003,

13  report, on page 2, about four paragraphs down, there's a

14  sentence that starts, "In my own experience and that of the

15  laboratory which I use in my practice" -- do you see that

16  particular sentence?

17     A     Yes, I do.

18     Q     What laboratory is that you are referring to in

19  that sentence?

20     A     Oh, that would probably be Wuesthoff.   I don't

21  know if I would have this issue come up with

22  Dr. Goldberger's lab or not.   I don't think specifically we

23  have.

24     Q     That was the lab that you used when you worked at

25  the Orlando ME's office, correct, Wuesthoff?

1  confirm with the same method.

2      Q    Do you recall actually having that experience with

3  Wuesthoff?

4      A    Oh, yeah, any time we wanted to quantitate the

5  specimen.

6      Q    Had you ever done that in the context of reported

7  carboxyhemoglobin or carbon monoxide results?

8      A    I can't recall repeating a carbon monoxide, but it

9  may have happened.

10     Q    Do you have an understanding as to the type of

11  method that the Wuesthoff lab uses to analyze post-mortem

12  blood samples for the existence of carbon monoxide or

13  carboxyhemoglobin?

14     A    I'm not sure which specific method they're using

15  at this point.

16     Q    Do you know if the Weusthoff lab uses sodium

17  dithionite in its analysis of post-mortem blood samples to

18  determine the existence of carboxyhemoglobin or carbon

19  monoxide in such samples?

20     A    I don't know which one they're using.  They may be

21  using a couple.  Frequently, laboratories will use a number

22  of methodologies.

23     Q    How long did you work in the medical examiner's

24  office in Orlando?

25     A    I was there from about 1990 until last October.

1    Q    Okay.

2    A    Q-a-t-r-o-c-c-h-i, I think.  Frank is his first

3  name.

4    Q    Anybody else?

5    A    Yeah.  I talk with Dr. Goldberger fairly often.

6    Q    He's not with the Wuesthoff lab, correct?

7    A    That's why I say, at this point, we use

8  Gainesville as well.

9    Q    Anybody else that was contemplated by the

10  statement "Daily interactions with toxicologists in the lab

11  I use" other than Ms. Sullivan, Dr. Qatrocchi, and

12  Dr. Goldberger?

13    A    Any of the toxicologists I happen to talk to that

14  may be working.  Not every day, but frequent interactions.

15    Q    So is the word "daily" correct as used in this

16  paragraph on page 2 of your report?

17    A    Well, I don't talk to them necessarily every day.

18    Q    How often do you talk to them, or did you talk to

19  them?

20    A    Probably a couple times a week on tox issues but

21  we do have daily interactions in that we, again, are

22  constantly getting tox reports back and issues come back and

23  so forth.

24    Q    In the second paragraph of page 2 of your

25  April 14, 2003, report, you state, "This methodology is

1   employed in a number of crime labs around the country and

2   represents a significant improvement in analytical accuracy

3   in post-mortem samples."

4           When you say "this methodology," I assume we're

5   talking about the Kentucky methodology?

6       A   Correct.

7       Q   What crime laboratories around the country is the

8   Kentucky methodology used at?

9       A   I'm not sure.  I can't give you a list.  I know

10  that they're not the only place in the country that's using

11  it, and it's accepted as a pretty good method.

12      Q   What's the basis for your statement if you don't

13  know what labs use it?

14      A   Talking with the toxicologists, getting the paper

15  that we talked about.

16      Q   Talking with the toxicologist, meaning

17  Mrs. Sullivan?

18      A   And others, yes.

19      Q   Who are the others?

20      A   I don't remember.

21      Q   And you also mentioned the paper --

22      A   That's the one we just marked -- went through with

23  the long title.

24      Q   -- we just marked as Exhibit 9?

25      A   Right.

1     A     I assume so.

2     Q     Have there been other occasions where articles you

3   have submitted for publication have not passed peer review?

4     A     Well, I haven't submitted that many for

5   publication.  So far I have basically done couple of text --

6   textbook and Dr. Wechts, which I presume he reviewed.

7     Q     On page 2 of your report, I was discussing the

8   second paragraph.  And the last clause in that paragraph

9   states, when discussing the Kentucky methodology,

10  "Oftentimes comparing favorably when samples are run

11  concurrently with the GC-MS methodology."

12          Do you see that statement, sir?

13    A     Yes.

14    Q     What is the basis for that statement?

15    A     I think that basically was -- I'm not sure if it

16  was in the paper or not, but --

17    Q     "The paper" meaning what we have marked as Exhibit

18  9?

19    A     Right.

20          But I think that was it.  It was in the paper and

21  also that was the opinion of Ms. Sullivan, in their

22  experience.

23    Q     Any other basis for that statement other than the

24  paper we have marked as Exhibit 9 and the statement of

25  Ms. Sullivan?

1  appreciate also having an answer to is if you actually know

2  the method that the Kentucky lab used to analyze

3  Mr. Nelson's blood sample.  And, if so, what is your

4  understanding of the method that was used.

5            MR. TAMAYO:  Objection.  Asked and answered.  It

6  also calls --

7            THE WITNESS:  No, I don't know the steps and the

8  procedures that they used.

9  BY MR. GOFF:

10     Q    In your April 14, 2003, disclosure on page 2, the

11  first paragraph, there appears to be a reference to the

12  Kentucky lab technique.  And there's a sentence that states,

13  "The Kentucky lab technique factors any potential

14  interference such as methemoglobin by using the same

15  specimen of blood and oxygenating one sample, carboxylating

16  another sample, and analyzing the third remaining specimen

17  in comparison to the oxygenated and carboxylated samples."

18     A    Right.

19     Q    Do you see that sentence?

20     A    Yes.  That's the --

21     Q    Did you write that sentence?

22            MR. TAMAYO:  It's been asked and answered.

23            THE WITNESS:  Yes.  That's the creation of the

24  blank, but how they do that, I don't know the methodology.

25  BY MR. GOFF:

1    Q    Is this actually you writing this sentence or did
2 you just copy it from somewhere?

3    A    No.  I wrote it.

4    Q    Where did you get this information from?

5    A    I guess from this paper.

6    Q    The paper that we have marked as Exhibit 9?

7    A    Yes.

8    Q    Do you know for a fact that that's where you got
9 that information from?

10   A    Or from the part of the depo that I read.  I don't
11 remember exactly.

12   Q    The part of whose depo, please?

13        MR. TAMAYO:  Objection.  It's been asked and
14 answered.

15        THE WITNESS:  Who's the toxicologist?

16 BY MR. GOFF:

17   Q    Mike Ward?

18   A    Ward's depo, correct.

19   Q    Okay.  Is it your understanding that under this
20 method -- or, strike that.

21        Tell us what is meant by what you state here,
22 "carboxylating another sample."

23        It's on next to the last line in the first
24 paragraph.

25   A    I know where it's at.  I'm trying to figure out

1   why --

2         I know that in this procedure -- I'm not sure

3   exactly the method, how they do it, but in order to create

4   the blank against carboxyhemoglobin that they create it and

5   then that is used as a blank against the other sample.  And

6   I don't remember -- I might have got that from probably

7   talking to Linda.

8      Q    They created what specifically, please?

9      A    Carboxylating, the sample carboxyhemoglobin.

10     Q    In what form, shape, format?

11     A    I'm not sure how they do it.  I don't know the

12  methodology of doing this.  The point of putting this in was

13  so this is the way they create their blank for that

14  procedure, but I don't know the technical details of how

15  they do it.

16     Q    Would it be fair to say, Dr. Anderson, that the

17  methodologies and procedures used to analyze blood samples

18  for the existence of carbon monoxide and carboxyhemoglobin

19  are something within the expertise of a toxicologist and not

20  in the expertise of somebody like yourself, a pathologist?

21         MR. TAMAYO:  Object to the form.

22         THE WITNESS:  I think I have been trying to tell

23  you that for the last half hour, actually.

24  BY MR. GOFF:

25     Q    Would you, therefore, agree with me, Dr. Anderson,

1   that in terms of how the Kentucky lab method was used in

2   this case and what were the details of that, that would be

3   something for which you would·defer to a toxicologist to

4   answer?

5       A    Correct.

6            MR. TAMAYO:  Object to the form.

7   BY MR. GOFF:

8       Q    Would it also be fair to say, Dr. Anderson, that

9   the effects, if any, of using ammonium hydroxide or sodium

10  dithionite, or both of those elements, in a post-mortem

11  blood analysis, would be something outside your area of

12  expertise and you would, likewise, refer or defer to a

13  toxicologist to answer those questions?

14           MR. TAMAYO:  Object to the form.

15           THE WITNESS:  That would be a testing analytical

16  question.  I would defer.

17  BY MR. GOFF:

18      Q    To a toxicologist?

19      A    To a toxicologist.

20      Q    Would it be fair to say, Dr. Anderson, that you do

21  not consider yourself qualified to render opinions as to

22  whether the method used by the Kentucky laboratory in this

23  case to analyze Mr. Nelson's post-mortem blood sample for

24  the existence of carboxyhemoglobin was appropriate within a

25  reasonable degree of toxicological probability?

# EXHIBIT "2"



DEFENDANT'S EXHIBIT

# Measurement of Carboxyhemoglobin in Forensic Blood Samples Using UV-Visible Spectrometry and Improved Principal Component Regression

**WILLIAM J. EGAN,\* WILLIAM E. BREWER, and STEPHEN L. MORGAN†**

*Department of Chemistry and Biochemistry, The University of South Carolina, Columbia, South Carolina 29208 (W.J.E., S.L.M.); and Toxicology Department, South Carolina Law Enforcement Division, 4416 Broad River Road, Columbia, South Carolina 29210 (W.E.B.)*

The forensic determination of carboxyhemoglobin (COHb) in blood was performed by using an improved principal component regression (PCR) technique applied to UV-visible spectra. Calibration data were decomposed into principal components, and the principal components useful for prediction were selected by their correlation with calibration spectra. Cross-validation of prediction results was done by leverage-corrected residuals. Confidence and prediction intervals derived from classical regression theory were found to be reasonable in size. The results compared favorably to a comparison study conducted by using aC O Oximeter method. In analysis of forensic case study samples, the improved PCR method allowed detection of abnormal samples and successfully predicted percentages of COHb and methemoglobin (MetHb), and provided error estimates for those predictions.

Index Headings: Chemometrics; Principal component regression; PCR; Forensic chemistry; UV-vis spectrometry; Carboxyhemoglobin; Carbon monoxide; Confidence and prediction intervals.

## INTRODUCTION

Fatalities due to carbon monoxide (CO) poisoning are an enduring concern. Over the period from 1979 until 1988, CO exposure was the number one cause of poisoningd eath in the U.S.A.[1] There were 56 133C O related deaths: 15 523 involving fires/burns, 25 889 suicides, 210 homicides, 1957 from "intent undetermined", and 11 547 that were unintentional. For the unintentional deaths, 57% were caused by motor vehicle exhaust; 23% involved stoves, heaters, and other home combustion sources; 2% involved industrial processes; and 20% were from unspecified sources. In England and Wales, roughly 1000p eople die yearly from CO poisoning, which was also the leading cause of poisoning death in children.[2] Cook et al.[3] studied CO poisonings in Colorado during 1986–1991; there were 981 cases, including 174 deaths. The majority of the fatalities involved fires, kerosene or space heaters, and motor vehicle exhaust.

For the forensic pathologist, the important issue is whether CO poisoning was the actual cause of death. Commonly, carboxyhemoglobin (COHb) levels in victims of house fires and exhaust fumes are quite high, 57 and 79% on average, respectively.[4] Normally, if COHb exceeds 50%, the exposure is fatal; however, COHb concentrations as low as 20–30% can cause death. Critical factors lowering the lethal COHb amount are young/old

age and diseases of the respiratory/coronary systems. Yoshidae t al. found the elderly were more likely to die at lower COHb amounts.[5] Other researchers have reported similar findings.[6–8]

The determination of carboxyhemoglobin in blood requires consideration of the usual four states of human hemoglobin (Hb): oxyhemoglobin (OHb),d eoxyhemoglobin (dOHb),c arboxyhemoglobin (COHb), and methemoglobin (MetHb). The ultraviolet-visible spectra of the four Hb variants are shown in Fig. 1.[9,10] Normal respiratory processes cycle Hb between the oxygenated and deoxygenated states. Carbon monoxide binds to hemoglobin with an affinity roughly 250–300 times that of oxygen, so an exposure to an atmosphere containing just 0.1% CO is sufficient to transform 50% of the Hb to COHb. COHb has a distinctive cherry red color, adding a "healthy glow"t o many victims' appearances. CO concentration, exposure time, and an individual's level of exertion are the prime factors affecting the appearance of symptoms (or lack thereof) in this chemically induced anemic hypoxia.

MetHb, green-brown to black in color, is formed when the iron atoms in hemoglobin are oxidized to the ferric state; hemoglobin in this state is no longer capable of reversibly bindingo xygen or carbonm onoxide. A considerable number of drugs andc hemicals, includingn itrates, sulfonamides, and aniline derivatives, have been found to cause MetHbf ormation. Katsumata et al.[11] report that victims of gas combustion were shown to have negligible levels of MetHb in their blood (0.9 ± 0.4%), while victims of fire and vehicle exhaust poisoning had much higher levels of MetHb (15.0 ± 7.7 and 15.2 ± 7.7%, respectively). Thea uthors attribute this finding to the inhalation of nitrogen oxides produced during the fire or by the fuel combustion. MetHb may be determined by a separate calibration or it may be converted to dOHb by the addition of $Na_2S_2O_4$ (sodium hydrosulfite or sodium dithionite).[12]

Sulfhemoglobin (SHb) is an extremely uncommon hemoglobin variant. It is generally found only in chronic multiple-drug users; no trace of SHb was observed in 4066 individuals examined in one study.[13] Consequently, we did not evaluate SHb in this research.

In the investigation of COHb levels, probable baseline values should also be considered. In their study of 29 000 blood donors, Stewart et al.[14] found that detectable levels of COHb in healthy individuals normally arise from endogenous production (0.45%), cigarette smoking (3–7.7% over the rangeo f 1/2 to 2 packs per day), and air

Received 16 July 1998; accepted 16 October 1998.
\* Current address: Argonne National Laboratory, Analytical Chemistry Laboratory, 9700 S. Cass Ave., Argonne, IL 60439.
† Author to whom correspondence should be sent.

0003-7028/99/5302-0218$2.00/0
© 1999 Society for Applied Spectroscopy



FIG. 1.  Normalized absorbance spectra of different types of hemoglobin: Ohb = oxyhemoglobin, COHb = carboxyhemoglobin, dOHb = deoxyhemoglobin, and MetHb = methemoglobin. Spectra were normalized to unit length.

pollution (levels greater than 1.5% occurred in 45% of nonsmokers). Aker,[15] studying 198 volunteers, found nonsmokers had COHb levels ranging over 1.7–3.5%, and 1–2 pack per day smokers had COHb levels ranging over 4.4–9.3%. These results show that background levels, while possibly important to the health-care practitioner, are not large enough to compromise a determination of death by CO poisoning.

Measurement of COHb has traditionally been accomplished by spectrophotometric methods using absorbances at two wavelengths.[12,16–18] In clinical settings, dedicated spectrometers, e.g., CO Oximeters, have been developed which use absorbances at 4–17 wavelengths to calculate percent COHb. Although gas chromatography (GC) has been shown to be an accurate instrumental method for percent COHb determination, it is more time consuming and expensive.[19–24] Except at low levels of COHb, spectrophotometric methods have been found to be equivalent to GC. The common practice of taking the first and second derivatives of spectra has also been applied to the determination of percent COHb.[25–28]

The spectrophotometric methods listed above do not use the full spectral region available, but instead are limited to selected wavenumbers. Clinical researchers have successfully used a $\chi^2$ fit of known spectra (480–650 nm) of standards to unknown spectra to perform multicomponent analysis (MCA) for the determination the hemoglobin composition of blood samples.[29] MCA performed well when tested on 4066 blood samples.[13] Although diagnostic measures were not used to validate predictions, comparison of MCA with GC showed excellent agreement.[30] MCA has been further applied to monitor antidotal uses of MetHb-forming chemicals in the treatment of cyanide poisoning.[31]

In the present paper, we describe the development, testing, and application of a modified principal component regression (PCR) algorithm to the forensic problem of COHb determination. Multivariate calibration enables the analyst to employ the entire spectrum for simultaneous quantitation of all relevant species without reduction steps. The only related chemometric application we are

aware of is the paper by Wu et al.,[32] who examined the feasibility of standard principal component regression for calibrating oxyhemoglobin concentrations in clinical whole blood samples.

## EXPERIMENTAL

Blood was drawn from two of the researchers (both nonsmokers) with the assistance of the University of South Carolina Student Health Center. Whole blood was collected in 4 mL Vacutainers (Beckton Dickinson, Franklin Lakes, NJ) containing EDTA ($K_3$), as provided from the manufacturer.

COHb was created by bubbling $CO_{(g)}$ (National Specialty Gases, Durham, NC) through the whole blood for 2 h.[27] The COHb was then stored in sealed syringes with the smallest possible headspace volume at 6 °C to prevent loss of $CO_{(g)}$ via equilibrium into the headspace volume. It is critical that blood suspected to contain COHb be stored properly and analyzed as rapidly possible, since a 3h exposure to the atmosphere at room temperature is sufficient to lower a sample's percent COHb from 80 to 50%. See Chace et al.[33] for a comprehensive study and discussion of the COHb storage problem. Beutler and West[34] recommend that absorbances should be determined within 10–15 min of placing the blood sample in the cuvette; otherwise, they observed that a noticeable loss of COHb would occur in high COHb percentage samples in as little as half an hour.

Sodium hydrosulfite ($Na_2S_2O_4$, Fisher Scientific, Fair Lawn, NJ) was used to reduce all OHb and MetHb to dOHb. COHb is unaffected by this reduction. Spectra were obtained after a 2 min reaction time. Crystalline human MetHb (Sigma Chemical Co., St. Louis, MO) was used as purchased. OHb was prepared by bubbling oxygen (National Welders Supply Co., Charlotte, NC) through the whole blood for 2 h.

Total hemoglobin (THb) concentrations were determined by using the modification of Sato et al.[35] to the international standard method.[36] This method converts all forms of Hb to cyan-methemoglobin, even if high concentrations of COHb are present. The reaction time is shortened to 5 min from 180 min by the modification. The modified THb reagent contains 20 g $K_3Fe(CN)_6$ (Mallinckrodt, Inc., Paris, KY), 2.0 mL Triton X-100 (Sigma Chemical Co.), and 50 mg KCN (J. T. Baker, Phillipsburg, NJ) in a 1/30 mol/L $KH_2PO_4$–$K_2HPO_4$ (Fisher Scientific, Fair Lawn, NJ) buffer at pH 7.2 in a one liter total volume. THb reagent (5 mL) was mixed with 20 µL blood and allowed to react for 5 min. Total hemoglobin is calculated from a single wavelength absorbance as follows:

$$THb\left(\frac{g}{l}\right) = 367.7 \times A_{540nm}. \qquad (1)$$

This method was used to standardize all blood samples to equal THb content.

UV–vis spectra of the Hb samples were obtained by using a Hewlett-Packard 8453 UV–vis diode array spectrophotometer (HP, Palo Alto, CA). Each sample consisted of 30 µL blood (varied mixtures of Hb types) diluted with 3 mL 0.4 M $NH_4OH$ (EM Science, Gibbstown, NJ). The $NH_4OH$ is commonly added to prevent/lessen

turbidity. Beutler and West[34] found that, when samples with high COHb percentages were exposed to the atmosphere for short periods of time (10–30 min), there was a detectable loss of C OHb (~ 5%). Consequently, we minimized the atmospheric exposure of the 100% COHb standard and all high percentage COHb samples prepared from it.

Two simple experimental designs were used. Mixture set 1 included six samples, replicated and ranging from 0 to 100% COHb in 20% increments, with the remaining portion of blood being OHb. Mixture set 2 was a ternary mixture design including MetHb (0, 25, 33, 50, and 100%). Case study samples provided by the South Carolina Law Enforcement Division (SLED, Columbia, SC) were analyzed similarly. Spectra were collected over the 530–600 nm range. Replicates of four different CO Oximeter standards w ere analyzed separately for calibration comparisons. For all samples, spectra were acquired before and after reduction with $Na_2S_2O_4$.

An IL 282 CO Oximeter (Instrumentation Laboratory Company, Lexington, MA) was u sed for the comparison study. Standards purchased from the CO Oximeter manufacturer (control levels 1–4) were prepared for analysis in the same fashion as whole blood standards. (Note: samples from forensic death investigations analyzed by using a CO Oximeter must be reduced prior to analysis.)

The performance of the modified principal component regression algorithm was tested with the use of the fish meat data set from Næs.[37] This data set contains 45 near-infrared (NIR) spectra of rainbow trout meat, with intensities taken at nine wavelengths a long the percent fat for each observation. Following t he usage of Sutter et al.[38] the first 38 observations from the fish data set were split, with odd observations going into a calibration data set and even observations used for the validation data set.

Spectra were preprocessed and analyzed with the use of Microsoft Excel 97 (Microsoft Corporation, Redmond, WA) and MATLAB for Windows, v4.2c.1 (The MathWorks, Inc., Natick, MA).

## THEORY

**Multivariate Calibration.** The two most common methods for multivariate calibration are principal component regression and partial least-squares (PLS), with the latter being the more popular.[39–42] Both methods generate a set of latent variables useful for describing the relationship between instrumental responses and a property or analyte of interest. Unfortunately, the popularity of PLS over PCR is partly due t o the fact that the basic theory behind PCR is often misunderstood or misapplied. Hence, PCR is often incorrectly performed, providing results of a l esser quality than PLS.

To see why PLS is generally believed to have an advantage over PCR, one must understand the particular philosophies behind their implementation. PLS simultaneously attempts to explain the variation in the data matrix $X$ ($n$ samples $\times$ $p$ variables) while forming a model to explain the relation of $X$ to the dependent variable $y$ ($n$ samples $\times$ 1).[40,43–45] Orthonormal vectors are sequentially calculated to best meet these twin goals. For more details o n the P LS algorithm, see the l isted references.

On the other hand, PCR begins by conducting principal component analysis[46] on $X$. PCA calculates vectors (principal components or PCs) which successively explain the greatest amount of variability in the data, subject to the restriction that PCs are uncorrelated. The most numerically stable way to accomplish this is by the singular value decomposition (SVD) algorithm.[47,48] SVD decomposes the d ata matrix of $X$ into the product of three matrices:

$$X_{n \times p} = U_{n \times k} S_{k \times k} V'_{k \times p}. \tag{2}$$

The columns of the matrix $U$ contain the projections of the samples on the $k$ principal components (PC scores, normalized to unit length). T he matrix $S$ contains the square roots of the eigenvalues of $X$ (the singular values) on the d iagonal; the m atrix contains all zeros elsewhere. The singular values are ordered largest to smallest from top left to bottom right. The columns of the matrix $V$ contain the weights of the original variables (the loadings) necessary t o form the principal component scores ($U \times S$). The columns o f the score and loading matrices are orthonormal; i.e., $U'U = V'V = I$. (Note: any preprocessing, such as mean centering $X$ and/or $y$, is assumed to have already occurred, and we use no special notation to represent this.)

For standard multivariate regression,[49]

$$X_{n \times p} b_{p \times 1} = y_{n \times 1} \tag{3}$$

where $X$ is the samples by variables data matrix, $b$ is the regression coefficient vector, and $y$ is the dependent variable vector. When SVD is used to calculate the r egression,[50] the regression coefficients $b$ are found from

$$b_{p \times 1} = V_{p \times k} S^{-1}_{k \times k} U'_{k \times n} y_{n \times 1}. \tag{4}$$

The diagonal elements of $S$ are crucial to the stability of the regression model. Extremely small values, when inverted, assign great significance to principal components representing only as mall fraction of the variation in the data. In many cases, the latter PCs represent variation from noise and will, when included in the model, seriously undermine the quality of the fit. It is recommended that elements of $S$ less than or near machine precision be identified and that the resulting extremely large elements of $S^{-1}$ bes et to zero to avoid this problem.[48]

Equation 4 assumes that all PCs are included in the regression model. Traditionally, the question of which PCs to include in the model has been resolved as follows: split the data in two, making a calibration and validation data set. Then, the c alibration data set is used to predict the validation data set. PCs are added to the calibration model in order of variability, highest first, until a minimum in prediction error is achieved.[40] Stopping the addition of PCs at the first minimum that occurs has been found to work well.[51] Cross-validation, also known as jackknifing,[52] performed by leaving each observation out, one at a time, and predicting that observation's response, is au seful alternative when there are not enough observations to form separate calibration a ndv alidation ata sets. Also, leverage values (discussed below) may be used to approximate the leave-one-out process in PCR.[53,54]

A considerable amount of research on methods for selecting PCs for inclusion in the regression model has shown that the commonly used procedure of selecting

PCs based on their variance does not yield the optimal model. Rather, selection by the correlation between each PC and the dependent variable y provides much better and more parsimonious models.[35-39] Because PCs are, by definition, uncorrelated (orthogonal), inclusion or exclusion of a PC from the model has no influence on the correlation between other PCs and the dependent variable. The squared multiple correlation coefficient ($R^2$) for the $i$th PC ($u_i$) may be defined as

$$R_i^2 = \frac{y'u_i u_i' y}{y'y} \quad \text{(assuming y has been mean centered).} \quad (5)$$

To summarize, variance does not equal importance when calculating a PCR model. Therefore, it is required for PCR that a two-step process be followed: (1) decomposition of the data into PCs, and (2) determination of which PCs are useful, according to their correlations with y. The references listed above show that PCR performed in this manner provides results equivalent in quality to those of PLS.

**Statistical Inference.** Once the fitted and, possibly, predicted values are found, some estimate of the error in these values is necessary. Also, it is desirable to know whether any variables from the model re superfluous and can be excluded. For PCR, Gemperline et al.[40] have shown that useful confidence intervals for the regression coefficients may be determined by formulating the ordinary least-squares (OLS) regression Scheffé calculation in terms of SVD and using then umber of PCs included in the model to determine the degrees of freedom. This approach permits determination of the statistical significance of the original variables, and those variables whose confidence intervals include zero may be excluded. We extend the work of these authors to include calculation of confidence and prediction intervals for the fitted and predicted values in PCR. For further discussion of confidence and prediction intervals, see Neter et al.[49] or Hocking.[61]

We note that while this paper was in preparation, an extensive treatise[62] on the propagation of errors in OLS, PCR, and PLS was published. The PCR model we present appears to be a special case of the t heorem presented in that paper. However, we use leverage values instead of $t$-tests for the selection of PCs. Furthermore, the previous paper stops with the standard error of predicted values and does not address extension of the classical confidence or prediction interval calculations of our model.

**Calculations.** The "Hat" matrix[63] H, a standard feature of OLS, is the product of the score matrix with itself and, when multiplied by y, gives the fitted values from the regression model:

$$H = UU' \quad (6)$$

$$\hat{y}_{n \times 1} = Hy. \quad (7)$$

The diagonal values of H are called the leverage values ($h_{ii}$), and indicate how important each observation is to the regression. Large leverage values may indicate unusual or outlying observations.[64] Since H may be formed with only some portion ($j$) of the total $k$ PCs, the OLS convention (unusual observations have $h_{ii} > 2p/n$ must be modified to reflect this; observations having $h_{ii} > 2j/$

$n$ should be examined further. The Hat matrix is also used to calculate the residual vector e:

$$e_{n \times 1} = (I_{n \times n} - H)y. \quad (8)$$

The sum of the squares o f the residuals (often called the sum of the squares of error, SSE) is calculated directly from the residuals:

$$SSE = e'e. \quad (9)$$

The mean squared error (MSE) is then obtained by dividing SSE by its associated degrees o f freedom:

$$MSE = \frac{SSE}{n - p}. \quad (10)$$

The root-mean-square error (RMSE) is simply the square root of MSE.

Leverage values may be used to adjust residuals, approximating the leave-one-out cross-validation method by correcting the residuals for the importance of each observation.[53,54] This leverage-corrected residual (LCR) method gives adjusted residuals, $e_c$, which are then used to assess changes in RMSE as PCs are added to the model.

$$e_c = \frac{e_i}{1 - h_{ii}}. \quad (11)$$

Use of leverage values involves a significant danger—multiple outliers may distort the covariance matrix to such an extent that neither will the leverage values identify outliers (the masking effect) nor will the LCR correctly choose PCs for inclusion in the model. The COHb calibration data described below were examined by using the SHV method described in our paper on multivariate outlier detection.[65] No outliers were detected. Thus, the leverage values for the calibration were undistorted and were suitable for modeling in this case.

The estimated variance-covariance matrix is

$$S_b^2 = MSE \ (VS^{-2}V). \quad (12)$$

The Bonferroni simultaneous confidence intervals for the $p$ regression coefficients, when $j$ PCs are included in the model, are given by

$$b \pm \text{diag}(S_b) \times t_{[1-(\alpha/2p); n-j]}. \quad (13)$$

Scheffé simultaneous confidence intervals are calculated as

$$b \pm \text{diag}(S_b) \times \sqrt{jF_{(\alpha; j; n-j)}}. \quad (14)$$

To calculate simultaneous confidence intervals for the $n$ fitted responses, use the smaller of the Working–Hotelling confidence intervals and the Bonferroni confidence intervals:

$$s_{\hat{y}}^2 = MSE \times h_{ii} \quad (15)$$

$$\hat{y} \pm s_{\hat{y}} \times \sqrt{jF_{(\alpha; j; n-j)}} \quad \text{(Working–Hotelling)} \quad (16)$$

$$\hat{y} \pm s_{\hat{y}} \times t_{[1-(\alpha/2p); n-j]} \quad \text{(Bonferroni)} \quad (17)$$

where $s_{\hat{y}}$ is the square root of the estimated variances (standard errors) of the fitted values.

Prediction intervals for $q$ new observations, $X_q$, first require that any preprocessing performed on X be applied to $X_q$. The predicted values ($\hat{y}_q$) for $X_q$ are calculated by



FIG. 2.   RMSE results for the two cross-validation methods applied to IPCR of the fish meat data. PCs were added to the model in order of correlationw ith percent fat. Both the leverage-corrected residual and external validation methods attain their first minima at 4 PCs (1, 3, 2, and 5).



FIG. 3.   IPCR prediction of the validation data set for fish meat data. Symbols: O represent thep redicted percent fat, + represent the 95% prediction intervals, and the diagonal line represents the line of perfect fit.

multiplying $X_q$ by $b$. To calculate prediction intervals, one must convert the observations in $X_q$ to their normalized PC scores ($U_q$) by m ultiplying them by $VS^{-1}$. The matrix $U_q$ is used to calculate the leverage values for the new observations[ $h_{ii}(q)$, Eq. 6] and to calculate $s_q$:

$$s_q^2 = MSE \times (1 + h_{ii}(q)).$$   (18)

The smaller of the Scheffè or Bonferroni simultaneous prediction limits are then used:

$$\hat{y}_q \pm s_y \times \sqrt{qF_{(a;q;n-f)}}$$   (Scheffè)   (19)

$$\hat{y}_q \pm s_y \times t_{[1-(a/2q);n-f]}$$   (Bonferroni).   (20)

We refer to the modified PCR method described above (selection of PCs by $R^2$ and deleted residual RMSE; confidence/prediction intervals) as improved PCR (IPCR).

## RESULTS AND DISCUSSION

**Fish Meat Data.** The improved principal component regression approach was validated by testing on the fish meat data set. After mean centering, IPCR was used to model the fish meat calibration data. PCs entered the model in order of $R^2$, and RMSE was evaluated for the validation data set with the use of the leverage-corrected residuals. Figure 2s hows the change in RMSE as PCs are added to the model. Both the LCR methoda ndt he validation data indicate that four PCs (specifically PCs 1, 3, 2, and 5) are optimal. Sutter et al.[38] also found, via best-subset selection, that these particular PCs provided the best PCR model. The agreement of the LCR method with the validation data was expected, because leverage values for each PC are independent of the leverage values for other PCs; thus, the previously demonstrated effectiveness of the LCR method[53,54] should not be affected by altering the order of PC entry into the model. The prediction plot for the fish meat validation data, with 95% prediction intervals, is shown in Fig. 3. As can be seen, the prediction intervals provide reasonable estimates of theu ncertainties for each observation.

**COHb Calibration.** The unreduced mixture set 1, containing 0–100% COHb, was analyzed with IPCR. The

LCR methods elected PCs 1–2a s optimal. The calibration plot is shown in Fig. 4. The fitted model had an excellent $R^2$ of 0.9958, and the confidence intervals were relatively narrow. Confidence intervals at the9 5% level for the regression coefficients are shown in Fig. 5. The 535–550 nm region contains a number of wavelengths whose confidence bands include zero and could be omitted; the confidence bands in the 580–590 nm region, while rather wide relativet o theo ther wavelengths, still do not contain zero.

When the reduced mixtures were analyzed, essentially the same results were obtained (Fig. 6). PCs 1–2 were found to be optimal, and thef itted model produced a $R^2$ value of 0.9991 with quite narrow confidence intervals.

**CO Oximeter Standards.** Predictions for the unreduced and reduced CO Oximeter standards by using the two IPCR models were quite good. Table I shows the results for the unreduced standards. Predicted percent COHb levels for all but one of the standards were within the listed range; the 21.8–25.2% COHb standard had slightly high predicted percent COHb for both replicates.



FIG. 4.   IPCR calibration results for the unreduced replicate mixes of COHb and OHb (based on spectra over the 530–600 nm range).



FIG. 5.   Regression coefficients and 95% confidence bands for unreduced COHb calibration by IPCR.

That standard also had high leverage values for both samples, indicating that they were unusual in some fashion. Table II lists results for the reduced standards. Although the prediction intervals were narrower, the predicted percentages for COHb were slightly (~ 5%) high for this analysis. The 21.8–25.2% COHb standard still had high leverage values.

**Case Studies.** Seven samples from forensic cases (fire deaths) were provided by SLED. The samples were analyzed, after reduction, with the CO Oximeter, according to the usual protocol at SLED. Spectra of the blood from the seven cases (unreduced and reduced) were then acquired with the Hewlett–Packard 8453 UV–vis diodea rray spectrophotometer.

The predicted COHb percentages from the different methods for the seven samples are shown in Table III. All cases except case A were analyzed in duplicate by the CO Oximeter. Cases F and G were observed to be brown in color, an indication of thep resence of MetHb. These samples also had large leverage values in unreduced IPCR; case F still had a large leverage value after reduction. These two cases were also the only cases to



FIG. 6.   IPCR calibration results for replicate mixes of COHb and OHb after reductionw ith Na₂S₂O₄ (based on spectra over the 530–600 nm range).

differ in predicted percent COHb after reduction. It is possible that the fire in which the victim from case F died produced significant hemoglobin degradation products. The spectra of the seven case samples are shown in Fig. 7. Cases F and G have spectra with shapes similar to that of MetHb (see Fig. 1).

For cases A, C, andE , the predicted percentages for COHb from IPCR were in good agreement with results from the CO Oximeter. The spectra of case A is very similar visually to that of OHb; analysis by all methods showed predicted essentially zero COHb in case A. Cases B and D, on the other hand, had considerably lower predicted percentages for COHb from IPCR analysis than from the CO Oximeter. It is likely that loss of COHb in these samples occurred during transport.

Mixture set 2, the ternary mixtures containing 0–100% MetHb, was also analyzed with IPCR. The fitted model for the unreduced mixture set 2 produced an $R^2$ of 0.9884 by using PCs 1, 2, 3, 4, and 9, selected by LCR. The fitted model for the reduced mixture set 2p roduced an $R^2$ of 0.9836, with the use of PCs 1–3. When these models were used to predict thep ercentageo f MetHb in the forensic case samples, cases F and G were predicted to have high levels of MetHb (82.99 ± 13.10% and 40.54 ± 13.53%, respectively, unreduced). These high predicted levels ofM etHb confirm the suspicions aroused by the brown color of the samplesa nd the high leverage values from the COHbm odel, whichi ndicated that samples F and G were unusual in some fashion.

## CONCLUSION

We have demonstrated that the improved PCRa pproach performs well as a multivariate calibration method. The combination of cross-validation by leverage-corrected residuals, after a check for outliers, and the selec-

**TABLE I.** IPCR calibration results for replicate analyses of three unreduced CO Oximeter standards.

| Standard ranges % COHb | Predicted % COHb | Prediction interval (±) | Leverage[a] |
|---|---|---|---|
| 1.8–5.2 | −0.45 | 9.07 | 0.2286 |
| 1.8–5.2 | 0.52 | 10.46 | 0.6346 |
| 21.8–25.2 | 29.67 | 16.49 | 3.0605 |
| 21.8–25.2 | 30.04 | 15.42 | 2.5523 |
| 60–63.4 | 60.20 | 8.47 | 0.0712 |
| 60–63.4 | 64.71 | 8.33 | 0.0357 |
| 96.2–99.6 | 98.99 | 9.25 | 0.2778 |
| 96.2–99.6 | 99.01 | 9.24 | 0.276 |

[a] High leverage values are underlined.

**TABLE II.** IPCR calibration results for replicate analyses of three CO Oximeter standards after reduction with Na₂S₂O₄.

| Standard ranges % COHb | Predicted % COHb | Prediction interval (±) | Leverage[a] |
|---|---|---|---|
| 1.8–5.2 | 6.25 | 4.08 | 0.1443 |
| 1.8–5.2 | 4.69 | 4.52 | 0.4074 |
| 21.8–25.2 | 35.73 | 7.32 | 2.6896 |
| 21.8–25.2 | 35.33 | 7.25 | 2.6236 |
| 60–63.4 | 63.86 | 4.28 | 0.2614 |
| 60–63.4 | 67.70 | 3.91 | 0.0518 |
| 96.2–99.6 | 106.34 | 4.27 | 0.2576 |
| 96.2–99.6 | 106.23 | 4.28 | 0.2636 |

[a] High leverage values are underlined.

TABLE III.  Comparison of CO Oximeter and IPCR results for samples from seven forensic case studies.

| Case | CO Oximeter (reduced) % COHb | IPCR (unreduced) % COHb | 95% Prediction interval (±) | Leverage[a] | IPCR (reduced) % COHb | 95% Prediction interval (±) | Leverage[a] |
|---|---|---|---|---|---|---|---|
| A | −1.2 | 3.13 | 11.02 | 0.90 | 5.90 | 4.89 | 0.73 |
| B | 86.6 91.3 | 78.04 | 8.52 | 0.14 | 78.44 | 3.92 | 0.11 |
| C | 92.6 67.8 | 79.41 | 8.46 | 0.12 | 83.00 | 3.96 | 0.13 |
| D | 94.2 85.1 | 60.51 | 10.01 | 0.57 | 63.26 | 4.75 | 0.63 |
| E | 74.9 71.8 | 75.93 | 8.72 | 0.19 | 77.00 | 3.85 | 0.07 |
| F[b] | 22.6 12.0 | 17.14 | 16.99 | _3.53_ | −3.44 | 6.22 | _1.79_ |
| G[b] | 48.8 44.2 | 40.90 | 15.27 | _2.65_ | 29.81 | 4.15 | 0.24 |

[a] High leverage values are underlined.
[b] Samples were brown in color, indicative of MetHb.

tion of PCs by their correlation with the dependent variable was successfully tested and applied to the hemoglobin calibration problem. Expressions for confidence and prediction intervals were derived from classical regression theory. Calculated confidence and prediction intervals were shown to be reasonable in size.

When applied to the multivariate calibration of COHb, the improved PCR method allowed detection of abnormal samples and successful prediction of the percentages of COHb in standards and provided error estimates for those predictions. The IPCR method does not require reduction of forensic samples prior to analysis, as does the CO Oximeter method currently used at SLED. While the CO Oximeter method does alert the analyst to the presence of MetHb, high leverage values from an outlier tested IPCR calibration provide more general warnings about the presence of unusual samples, because they are based on the full spectra. Furthermore, any UV-vis instrument may be used to acquire spectra for analysis by IPCR; the CO Oximeter is a dedicated, more expensive instrument. IPCR calibration of MetHb was also successful, confirming the presence of MetHb in two forensic case samples.

Given the difficulty of preparing high-concentration COHb samples and the loss of COHb from two of the case samples, we recommend that extreme care be taken in the storage of blood samples suspected to contain COHb.

## ACKNOWLEDGMENTS

Blood samples were drawn by Kenneth L. Corbin (University of South Carolina Student Health Center). This work was supported in part by a grant from the U.S. Department of Energy Cooperative Agreement DE-FC0291ER75666. Additional support was provided by Award 97-LB-VX-0006 from the Office of Justice Programs, National Institute of Justice, Department of Justice. Points of view in this document are those of the authors and don ecessarily represent the official position of the U.S. Department of Justice. A preliminary version of this work was presented as paper 380 at PITTCON 97.

1. N. Cobb and R. A. Etzell, JAMA 266, 659 (1991).
2. T. Meredith and A. Vale, Br. Med. J. 296, 77 (1988).
3. M. Cook, P. A. Simon, and R. E. Hoffman, Am. J. Pub. Health 85, 988 (1995).
4. D. J. Di Maio and V. J. Di Maio, Forensic Pathology (Elsevier, New York, 1989), Chap. 14.
5. M. Yoshida, I. Adachi, T. Watabiki, Y. Tatsuno, and N. Ishida, For. Sci. Int. 52, 13 (1991).
6. G. L. Nelson, D. V. Canfield, and J. B. Larsen, in Carbon Monoxide and Human Lethality: Fire and Non-fire Studies, M. M. Hirschler, Ed. (Elsevier, New York, 1993), Chap. 6.
7. S. M. DeBanne and D. Y. Rowland, in Carbon Monoxide and Human Lethality: Fire and Non-fire Studies, M. M. Hirschler, Ed. (Elsevier, New York, 1993), Chap. 7.
8. S. M. DeBanne and D. Y. Rowland, in Carbon Monoxide and Human Lethality: Fire and Non-fire Studies, M. M. Hirschler, Ed. (Elsevier, New York, 1993), Chap. 8.
9. Williams Hematology, E. Beutler, M. A. Lichtman, B. S. Coller, and T. J. Kipps, Eds. (McGraw-Hill, New York, 1995), 5th ed.
10. Casarett and Doull's Toxicology—The Basic Science of Poisons, M. O. Amdur, J. Doull, and C. D. Klaassen, Eds. (Pergamon Press, New York, 1991), 4th ed.
11. Y. Katsumata, M. Aoki, M. Oya, O. Suzuki, and S. Yada, J. For. Sci. 25, 546 (1980).
12. N. C. Klendshoj, M. Feldstein, and A. Sprague, J. Biol. Chem. 183, 297 (1950).
13. A. Zwart, E. J. van Kampen, and W. G. Zijlstra, Clin. Chem. 32, 972 (1986).
14. R. D. Stewart, E. D. Baretta, L. R. Platte, E. B. Stewart, J. H. Kalbfseisch, B. V. Yserloo, and A. A. Rimm, JAMA 229, 1187 (1974).
15. J. Aker, J. Am. Ass. Nurse Anesth. 55, 421 (1987).
16. N. W. Tietz and E. A. Fiereck, Ann. Clin. Lab. Sci. 3, 36 (1973).
17. F. L. Rodkey, T. A. Hill, L. L. Pitts, and R. F. Robertson, Clin. Chem. 25, 1388 (1979).
18. Y. Katsumata, M. Aoki, K. Sato, O. Suzuki, M. Oya, and S. Yada, J. For. Sci. 27, 928 (1982).



FIG. 7.  Normalized blood spectra of samples from seven forensic case studies.

19. H. A. Collison, F. L. Rodkey, and J. D. O'Neal, Clin. Chem. 14, 162 (1968).
20. A. Zwart, A. Buursma, B. Oeseburg, and W. G. Zijlstra, Clin. Chem. 27, 1903 (1981).
21. L. R. Goldbaum, D. H. Chace, and N. T. Lappas, J. For. Sci. 31, 133 (1986).
22. H. J. Vreman, J. J. Mahoney, A. L. Van Kessel, and D. K. Stevenson, Clin. Chem. 34, 2562 (1988).
23. M. B. Johansson and P. Wollmer, Clin. Physiol. 9, 581 (1989).
24. J. J. Mahoney, H. J. Vreman, D. K. Stevenson, and A. L. Van Kessel, Clin. Chem. 39, 1693 (1993).
25. Y. Fukui, M. Matsubara, S. Takabashi, and K. Matsubara, J. Anal. Tox. 8, 277 (1984).
26. A. Taulier, P. Levillain, and A. Lemonnier, Clin. Chem. 33, 1767 (1987).
27. B. J. Perrigo and B. P. Joynt, J. Anal. Tox. 13, 37 (1989).
28. M. Lopez-Rivadulla, A. M. Bermejo, P. Fernandez, A. Cruz, and L. Concheiro, For. Sci. Int. 40, 261 (1989).
29. A. Zwart, A. Buursma, E. J. van Kampen, and W. G. Zijlstra, Clin. Chem. 30, 373 (1984).
30. H. J. Vreman, D. K. Stevenson, and A. Zwart, Clin. Chem. 33, 694 (1987).
31. W. G. Zijlstra and A. Buursma, Clin. Chem. 39, 1685 (1993).
32. C. Wu, M. A. Kenny, M. Huang, M. A. Afromowitz, and P. Yager, Analyst 123, 477 (1998).
33. D. H. Chace, L. R. Goldbaum, and N. T. Lappas, J. Anal. Toxicol. 10, 181 (1986).
34. E. Beutler and C. West, Clin. Chem. 30, 871 (1984).
35. K. Sato, K. Tamaki, H. Hattori, C. M. Moore, H. Tsutsumi, H. Okajima, and Y. Katsumata, Forensic Sci. Int. 48, 89 (1990).
36. International Committee for Standardization in Haematology, J. Clin. Pathol. 31, 139 (1978).
37. T. Næs, Technometrics 27, 301 (1985).
38. J. M. Sutter, J. H. Kalivas, and P. M. Lang, J. Chemom. 6, 217 (1992).
39. P. J. Gemperline, J. Chemom. 3, 549 (1989).
40. H. Martens and T. Næs, Multivariate Calibration (John Wiley and Sons, New York, 1989).
41. E. V. Thomas, Anal. Chem. 66, 795A (1994).
42. S. D. Brown, Appl. Spectrosc. 49, 14A (1995).
43. H. Martens and T. Næs, "Multivariate Calibration by Data Compression", in Near-Infrared Technology in the Agricultural and Food Industries, P. Williamsa nd K. Norris, Eds. (American Association of Cereal Chemists, St. Paul, Minnesota, 1987), Chap. 4.
44. P. Geladi and B. R. Kowalski, Anal. Chim. Acta 185, 1 (1986).
45. A. Lorber and B. R. Kowalski, Appl. Spectrosc. 42, 1572 (1988).
46. I. T. Jolliffe, Principal Component Analysis (Springer-Verlag, New York, 1986).
47. G. H. Golub and C. F. Van Loan, Matrix Computations (The Johns Hopkins University Press, Baltimore, 1989), 2nd ed.
48. W. H. Press, B. P. Flannery, S. A. Teukolsky, and W. T. Vetterling, Numerical Recipes in C: The Art of Scientific Computing (Cambridge University Press, New York, 1988), pp. 60–71.
49. J. Neter, M. H. Kutner, C. J. Nachstein, and W. Wasserman, Applied Linear Statistical Models (Times Mirror Higher Education Group, Chicago, 1996), 4th ed., Chaps. 5–11.
50. J. Mandel, Am. Stat. 36, 15 (1982).
51. D. W. Osten, J. Chemom. 2, 39 (1988).
52. F. Mosteller and J. W. Tukey, "Data Analysis, Including Statistics", in The Collected Works of John W. Tukey, L. V. Jones, Ed. (Wadsworth and Brooks, Monterey, 1986), Vol. IV, Chap. 15.
53. T. Næs and H. Martens, J. Chemom. 2, 155 (1988).
54. A. Lorber and B. R. Kowalski, Appl. Spectrosc. 44, 1464 (1990).
55. I. T. Jolliffe, Appl. Stat. 31, 300 (1982).
56. I. A. Cowe and J. W. McNicol, Appl. Spectrosc. 39, 257 (1985).
57. D. Jouan-Rimbaud, B. Walczak, D. L. Massart, I. R. Last, and K. A. Prebble, Anal. Chim. Acta 304, 285 (1995).
58. I. Sun, J. Chemom. 9, 21 (1995).
59. A. M. C. Davies, Spectrosc. Eur. 7, 36 (1995).
60. P. J. Gemperline, J. R. Long, and V. G. Gregoriou, Anal. Chem. 63, 2313 (1991).
61. R. R. Hocking, Methods and Applications of Linear Models (John Wiley and Sons, New York, 1996).
62. K. Faber and B. R. Kowalski, J. Chemom. 11, 181 (1997).
63. D. C. Hoaglin and R. E. Welsch, Amer. Stat. 32, 17 (1978).
64. T. Næs, Chemom. Intell. Lab. Syst. 5, 155 (1989).
65. W. J. Egan and S. L. Morgan, Anal. Chem. 70, 2372 (1998).